IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RENETTA LANE                          :

                                      :

    v.                                :   Civil Action No. DKC 13-3566

                                      :

SYSTEMS APPLICATION &                 :
TECHNOLOGIES, INC., et al.            :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this Fair Labor Standards Act ("FLSA") case is a motion for summary judgment (ECF No. 41), filed by Defendants Timothy Adams ("Mr. Adams") and Systems Application & Technologies, Inc. ("SA-TECH") (collectively, "Defendants").  Also pending are two motions to suppress, filed by *pro se* Plaintiff Renetta Lane ("Plaintiff" or "Ms. Lane"),[1] (ECF Nos. 47 & 50), a motion for leave to amend her opposition to Defendants' motion for summary judgment, also filed by Plaintiff, (ECF No. 51), and multiple discovery-related motions (ECF Nos. 21, 23, 35, 37).  The issues have been briefed, and the court now rules, no hearing being deemed necessary.  Local Rule 105.6.  For the following reasons, the motion for summary judgment filed by Defendants will be granted.  Plaintiff's motions to suppress deposition and five affidavits will be denied.  The motion for leave to file an amended

---

[1] Plaintiff originally was represented by counsel, but is now *pro se*.

opposition filed by Plaintiff also will be denied. All discovery-related motions will be denied as moot.

**I.  Background**

    **A.  Factual Background**

SA-TECH is a "professional services company specializing in providing Operations & Maintenance (O&M), Program Management and Logistics support in highly regulated environments, to support the Test & Evaluation (T&E) and Training missions of a variety of Department of Defense customers. SA-Tech has over $40 million in revenue annually and employs over 300 people." (ECF No. 41-9, at 1 ¶ 4, Adams Affidavit). Timothy Adams is the President and CEO of SA-Tech. (*Id.* ¶ 3). SA-TECH hired Renetta Lane in 2006 to serve as a Quality Assurance Manager. (*Id.* ¶ 5). In that role, Plaintiff earned approximately $68,000 and was qualified as an "exempt" employee under the FLSA. (*Id.; see also* ECF No. 44, at 36 ¶ 7, Lane affidavit).

In approximately September 2007, the contract over which Ms. Lane was the Quality Assurance Manager was terminated. (ECF No. 41-9, at 1 ¶ 6). At that point, Ms. Lane accepted the position as an Executive Administrative Assistant to the President and CEO of SA-Tech, Mr. Adams. According to Defendants, Ms. Lane earned approximately $82,000 per year in her new role and was classified as "exempt" under the FLSA. (*Id.*). Plaintiff provides a different salary breakdown: "[m]y

annual salary from 2010 – 2012 was $74,003, $74,730, and $73,468, an average of $35 an hour, and an increase of $3 an hour during my 7 years at SA-TECH.  My salary earned prior to my resignation on July 12, 2013 was $41,109.11 having worked 14 of the 26 pay periods prior to my departure." (ECF No. 44-1, at 2 ¶ 8).

The parties disagree regarding Ms. Lane's primary duty as an Executive Administrative Assistant for Mr. Adams.  Plaintiff believes that she served primarily as a personal caregiver for Mr. Adams and largely performed tasks related to Mr. Adams's personal needs, rather than the operation of SA-TECH. Defendants assert that in addition to her role as the sole executive administrative assistant to Mr. Adams, in which capacity she performed administrative duties, Plaintiff also independently handled business-related tasks such as human resources and supervisory responsibilities.  Additional facts will be presented in the analysis section below.  Plaintiff resigned from SA-Tech on July 12, 2013.  (ECF No. 44-1, at 2 ¶ 10).

### B.  Procedural Background

On November 25, 2013, Plaintiff brought this action against Defendants SA-TECH and Timothy J. Adams, alleging violations of the Fair Labor Standards Act ("FLSA"), the Maryland Wage and

Hour Law ("MWHL"), and the Maryland Wage Payment and Collection Law ("MWPCL").  (ECF No. 1).

After both parties filed multiple discovery-related motions, Defendants moved for summary judgment on June 20, 2014. (ECF Nos. 40 & 41).  Plaintiff was provided with a *Roseboro* notice (ECF No. 43), which advised her of the pendency of the motion to dismiss and her entitlement to respond within seventeen (17) days from the date of the letter.  *Roseboro v. Garrison,* 528 F.2d 309, 310 (4th Cir.1975) (holding *pro se* plaintiffs should be advised of their right to file responsive material to a motion for summary judgment).  Plaintiff opposed the motion, (ECF No. 44), and Defendants replied (ECF No. 45). On August 18, 2014, Plaintiff filed a supplement to her opposition, (ECF No. 46), to which Defendants objected (ECF No. 49).  Plaintiff also filed a motion to suppress the use of her deposition (ECF No. 47), and a motion to suppress six affidavits (ECF Nos. 47 & 50).  Defendants opposed both motions to suppress.  (ECF Nos. 48 & 53).  Plaintiff then moved for leave to amend her opposition to Defendants' motion for summary judgment, (ECF No. 51), to which Defendants also objected (ECF No. 52).

## II.  Analysis

### A.   Plaintiff's Motions to Suppress[2]

### 1.   Deposition

After the motion for summary judgment was fully briefed, Plaintiff moved to suppress use of her own deposition as evidence on summary judgment.  (*See* ECF No. 47).  Plaintiff argues that her deposition should be excluded because it is incomplete, unsigned, and uncertified.  (*Id.* at 1).  Plaintiff asserts that she was not given the opportunity to make changes to her deposition, and includes a proposed four-page errata sheet.  (ECF No. 47-1).  Defendants object to the errata sheet and the suppression of the deposition, arguing that Plaintiff failed to submit her proposed changes within the allowable thirty-day time frame, and now attempts to make substantive changes to her deposition testimony.  (*See* ECF No. 48).

Plaintiff's deposition was taken on May 7, 2014.  The parties agree that Plaintiff requested to review her deposition, and that she received via email a copy of her deposition on May 21, 2014.  (ECF No. 47, at 1; ECF No. 48-1, at 1-3).  The deposition reporting company, Planet Depos, sent a letter to

---

[2] Because the parties rely on the evidence Plaintiff seeks to suppress in connection with the motion for summary judgment, the court first must adjudicate the motions to suppress.  *See Stanley Martin Companies, Inc. v. Universal Forest Products Shoffner LLC*, 396 F.Supp.2d 606, 611 (D.Md. 2005) (stating that prior to reviewing motion for summary judgment, the court must evaluate the admissibility of the evidence used in support of or in opposition to the motion).

Plaintiff to inform her that she had 30 days - from May 21, 2014 - to read and sign her deposition and to submit an errata sheet. (ECF No. 48-1, at 1).   Notably, the letter informed Plaintiff that if she did not return the errata and acknowledgement sheets within thirty (30) days, it would be assumed that her request for reading and signing her deposition was no longer desired. (*Id.*).   Discovery in this case closed on May 30, 2014 per the scheduling order.   (*See* ECF No. 12).   On June 3, 2014, defense counsel sent a letter to Planet Depos, stating: "[t]he discovery cutoff in this matter was May 30, 2014.   Please close Ms. Lane's deposition." (ECF No. 48-1, at 4).   Defense counsel sent a copy of this letter to Plaintiff.   (*Id.*).   Plaintiff states that because she "was notified that the deposition was shut down[, she] ceased errata corrections[,] waiting for determination from the court on several motions that plaintiff ha[d] pending[,] including a motion to extend discovery." (ECF No. 47, at 2). In the motion to extend the discovery deadline, filed on May 23, 2014, Plaintiff did *not* indicate that she needed more time to review her own deposition transcript. (*See* ECF No. 37).

Fed.R.Civ.P.   30(e)(1)   permits   "changes   to   deposition testimony in 'form or substance' if the changes are made within 30 days of notification that the transcript is available and accompanied by the reasons for making them."   *Wyeth v. Lupin Ltd.*, 252 F.R.D. 295, 296 (D.Md. 2008).   As recently explained

by Judge Hollander in *Maryland Elec. Industry Health Fund v.*
*MESCO, Inc.*, Civ. Action No. ELH-12-505, 2014 WL 853237, at *16
(D.Md. Feb. 28, 2014):

> [C]ourts have differed in the latitude
> granted to deponents seeking to alter their
> testimony.   To my knowledge, the Fourth
> Circuit has not squarely addressed the
> issue.   Some courts have allowed deponents
> *who adhere to the procedural requirements* of
> Rule 30(e) to change the substance of their
> deposition testimony.   *Wyeth*, 252 F.R.D. at
> 296 (citing *Foutz v. Town of Vinton,*
> *Virginia*, 211 F.R.D. 293, 295 (W.D.Va.
> 2002)).   Other courts "interpret the rule as
> foreclosing changes that materially alter
> the testimony or contradict the testimony."
> *Wyeth*, 252 F.R.D. at 296; *see Donald M.*
> *Durkin Contracting, Inc. v. City of Newark*,
> 2006 WL 2724882, at *5 (D.Del. Sept. 22,
> 2006) ("The errata sheet 'clarifications' in
> this case are akin to a student who takes
> her in-class examination home, but submits
> new answers only after realizing a month
> later that the import of her original
> answers could possibly result in a failing
> grade."). . . .   Recent decisions in this
> Court have adhered to the latter approach.
> *See Harden v. Wicomico Cnty.*, 263 F.R.D.
> 204, 308-09 (D.Md. 2009) [];  *Wyeth*, 262
> F.R.D. at 296.

(emphasis added); *see also In re Grant*, 237 B.R. 97, 108
(Bankr.E.D.Va. 1999) ("Rule 30(e) clearly states a 30 day time
limitation for modification of transcripts and fails to
formulate any exception to the rule."  As explained in *Harden*,
263 F.R.D. at 306, the "[f]ailure of the party or deponent to
return the deposition with properly executed changes within 30

days constitutes a waiver of the right to examine and read the transcript."

Plaintiff did not submit an errata sheet until August 18, 2014 – more than *eighty* days after the date she received the deposition transcript.   Moreover, Plaintiff cannot belatedly make substantive changes to her deposition testimony because she believes Defendants misconstrue her testimony to their advantage in their summary judgment papers.   Plaintiff does not provide clear or convincing reasons for making the substantive changes in her proposed errata sheet.   Many of the changes suggest that Plaintiff now seeks to elaborate on the responses she provided during her deposition, but that is not a sufficient ground for excluding from consideration her deposition in its entirety or for accepting her proposed changes at this late stage.

Furthermore, Plaintiff's argument that her deposition should not be considered overlooks the fact that indeed *she* relies heavily on her own deposition in arguing against summary judgment.   *See, e.g., Brown v. White's Ferry, Inc.*, 280 F.R.D. 238, 243 (D.Md. 2012) ("Plaintiffs cannot in good conscience ask the court to rely on the discovery responses in support of their motion and then argue that the evidence is incompetent to the extent that [defendant] relies on the same evidence.   Indeed, a party waives any objection to the admissibility of evidence on summary judgment by offering that evidence in support of its own

motion."). For instance, Plaintiff quotes various excerpts from her deposition in her opposition memorandum to the motion for summary judgment. (*See* ECF No. 44, at 10-12, 17-18, 27-29). Plaintiff also contends that "[i]n [her] deposition[,] she provides testimonial evidence that her primary duty is taking care of Mr. Adams." (*Id.* at 31). Accordingly, her motion to suppress her deposition will be denied.

### 2. Affidavits

After the summary judgment motion was fully briefed, Plaintiff moved to suppress in their entirety the statements from the following witnesses, whose affidavits Defendants attach as exhibits in support of their motion for summary judgment: Gianni Adams (ECF No. 41-12, at 1-4); Charles Smith (ECF No. 41-11, at 1-3); Candice Williams (ECF No. 41-15, at 1-2); Karen Chergoski (ECF No. 41-14, at 1-3); and Geoff DeZavala (ECF No. 41-13, at 1-6). Plaintiff argues that these witnesses are biased because they are related to Mr. Adams and employed by SA-TECH, that they misunderstand what constitutes "independent judgment" under the FLSA's administrative exemption, and that they are not being truthful about Plaintiff's core responsibilities at SA-TECH. (*See* ECF No. 50-1). Defendants construe Plaintiff's motion to suppress these affidavits either as a motion to strike or a surreply, either of which they contend is improper.

Plaintiff did not move to strike the affidavits, but to suppress them from consideration in adjudicating Defendants' motion for summary judgment.  The proper way for a party to object to an opposing party's motions, memoranda, or affidavits is through the briefs or memoranda that the party submits to the court.  *Muir v. Applied Integrated Technologies, Inc.*, Civ. Action No. DKC 13-0808, 2013 WL 6200178, at *4 (D.Md. Nov. 26, 2013).  "The court will then implicitly, if not explicitly, rule upon [the] objections in its consideration of the motion." *Id.* (*quoting McNair v. Monsanto Co.,* 279 F.Supp.2d 1290, 1298 (M.D.Ga. 2003)).  Plaintiff did not argue that these affidavits should be suppressed in her opposition to the motion for summary judgment.

Regardless of any procedural improprieties, however, Plaintiff's stated reasons for disregarding these affidavits do not warrant their suppression.  Under Fed.R.Civ.P. 56(c)(4), affidavits used to support or oppose a motion for summary judgment must: be made on personal knowledge; set out facts that would be admissible in evidence; and show that the affiant is competent to testify on the matters stated.  Here, Plaintiff does not dispute that the affidavits are made on personal knowledge or that each affiant is competent to testify, nor does she argue inadmissibility.  Rather, Plaintiff believes that each witness is either misconstruing or misrepresenting facts, which

10

goes to the witnesses' credibility.  Plaintiff's disagreement with the statements made in the respective affidavits is not a reason to suppress them from consideration.  Indeed, Plaintiff may – and does – attempt to rebut the statements made by Defendants' witnesses by providing affidavits from witnesses in support of her position.

Accordingly, Plaintiff's motion to suppress the five affidavits will be denied.

**B.   Plaintiff's Supplemental Exhibits and Motion for Leave to Amend her Opposition**

After Defendants' motion for summary judgment was fully briefed, Plaintiff filed 142 pages worth of exhibits, requesting that these exhibits be added to the affidavit she submitted in support of her opposition memorandum on July 18, 2014.  (ECF No. 46).  These exhibits largely consist of emails, copies of tickets to various events, resumes, office documents, and spreadsheets of appointments to which Ms. Lane asserts she accompanied Mr. Adams.  (*See* ECF No. 46-1).  Defendants characterize this submission as a surreply and request that it be stricken.  (*See* ECF No. 49).  As Defendants argue, Plaintiff does not offer any explanation for her delay in seeking to submit additional exhibits and why she could not submit these exhibits at the time she filed her opposition on July 18, 2014.  Although Plaintiff does not provide any explanation in her

11

supplemental submission as to the import of the emails and additional documents she includes as additional exhibits, the affidavit she provided as an exhibit to her opposition memorandum references multiple exhibits, presumably ones that she now seeks to add. Considering Plaintiff's *pro se* status, insofar as she references specific emails or documents in her opposition memorandum or affidavit which were not included as exhibits to her opposition, the court will consider the supplemental exhibits.[3]

The same cannot be said of Plaintiffs' motion for leave to amend her opposition memorandum, which she submitted over one

---

[3] It should be noted that *neither* party has presented the exhibits attached to their respective filings in an organized or logical sequence, making the court's job more difficult having to sift through the applicable evidence to which each party cites. (*See, e.g.,* ECF Nos. 44-1 through 44-5; *see also* ECF No. 41-2; 41-9). Moreover, neither party provides an index for the exhibits. *See* Local Rule 105.5 ("If any motion, memorandum or brief is accompanied by more than give (5) exhibits, the exhibits shall be tabbed and indexed.").

Moreover, some of the parties' filings contain personal identifying information, including Plaintiff's social security number and birthdate. (*See* ECF No. 36-1, at 4 & ECF No. 44-5, at 52-53). Pursuant to Fed.R.Civ.P. 5.2, personal identifying information should have been redacted. "It is the responsibility of counsel and the parties to redact personal identifiers. The clerk will not screen documents and will not reject them on the basis that they contain personal identifiers. Any party may request that a publicly filed document containing a full personal identifier be withdrawn and refiled with appropriate redactions." *See* Privacy Policy – Civil Cases (2004). Accordingly, ECF No. 36-1 and ECF No. 44-5 will be placed under seal and the parties will have seven (7) days to file redacted versions.

month after the motion for summary judgment was fully briefed.
(*See* ECF No. 51). Plaintiff does not explain why she seeks to
amend her opposition and a review of her proposed amended
opposition reveals that she largely raises the same arguments
she lodged in her original opposition brief. She also attempts
to introduce prior litigation involving SA-TECH. (*See id.* at 3-
4). Although Plaintiff cites Fed.R.Civ.P 15 regarding amendment
of pleadings, it does not apply here. A response to a motion
for summary judgment does *not* constitute a pleading under Rule
15. Per Fed.R.Civ.P. 7(a), pleadings include the complaint, the
answer to a complaint, counterclaim, or crossclaim, and – if
permitted by the court – a reply to an answer. It is wholly
unclear why Plaintiff needs yet another opportunity to address
the arguments made in Defendants' motion for summary judgment,
which she had a chance and did address in her original
opposition memorandum. Accordingly, her motion for leave to
amend the opposition will be denied.

**C.   Defendants' Motion for Summary Judgment**

**1.   Standard of Review**

A motion for summary judgment will be granted only if there
exists no genuine dispute as to any material fact and the moving
party is entitled to judgment as a matter of law. *See*
Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322
(1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250

13

(1986).   Once a properly supported motion for summary judgment
is filed, the nonmoving party is required to make a sufficient
showing on an essential element of that party's claim as to
which that party would have the burden of proof to avoid summary
judgment.   *Celotex,* 477 U.S. at 322–23.

Summary judgment is appropriate under Federal Rule of Civil
Procedure Rule 56(a) when there is no genuine dispute as to any
material fact, and the moving party is plainly entitled to
judgment in its favor as a matter of law.   In *Anderson v.
Liberty Lobby, Inc.*, 477 U.S. at 249 (1986), the Supreme Court
explained that, in considering a motion for summary judgment,
the "judge's function is not himself to weigh the evidence and
determine the truth of the matter but to determine whether there
is a genuine issue for trial."   A dispute about a material fact
is genuine "if the evidence is such that a reasonable jury could
return a verdict for the nonmoving party."   *Id.* at 248.   Thus,
"the judge must ask himself not whether he thinks the evidence
unmistakably favors one side or the other but whether a fair-
minded jury could return a verdict for the [nonmoving party] on
the evidence presented."   *Id.* at 252.

In undertaking this inquiry, a court must view the facts
and the reasonable inferences drawn therefrom "in the light most
favorable to the party opposing the motion."   *Matsushita Elec.
Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)

(*quoting United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405 (4th Cir. 2005). The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson,* 477 U.S. at 252.

A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted). Indeed, this court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt,* 999 F.2d 774, 778-79 (4th Cir. 1993) (*quoting Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987)).

**2. FLSA and MWHL Claims**

The FLSA "requires that employees be paid time and a half for work over forty hours a week." *Shockley v. City of Newport News*, 997 F.2d 18, 21 (4th Cir. 1993) (*citing* 29 U.S.C. § 207(a)(1)). The Maryland Wage and Hour Law ("MWHL") has a similar overtime wage requirement. See Md. Code Ann., Lab. & Empl. §§ 3-415(a), 3-420(a). Both statutes also rely on regulations to define and interpret the exemption provision.

"The FLSA, and, by extension, the MWHL, exempt certain employees from the requirements of overtime wages, including

employees in a bona fide . . . administrative, or professional capacity." *Drubetskoy v. Wells Fargo Bank, N.A.*, Civ. CCB-13-2196, 2013 WL 6839508 (D.Md. Dec. 20, 2013); *see also* 29 U.S.C. § 213(a)(1); Md. Code Ann., Lab. & Empl. § 3-403(1). "Administrative capacity" has the same meaning under the regulations governing the MWHL as it does under the FLSA regulations. *See* Md. Code Regs. 09.12.41.01. Thus, an employee who qualifies for the administrative exemption under the FLSA also will qualify for that exemption under the MWHL.

The FLSA exemptions "are affirmative defenses to an FLSA claim," and they must "be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960); *Smith v. ABC Training Ctr. of Maryland, Inc.*, No. JFM-13-306, 2013 WL 3984630, at *9 (D.Md. Aug. 1, 2013). The burden of proof is on the employer to establish "by clear and convincing evidence that an employee qualifies for exemption." *Shockley*, 997 F.2d at 21; *see also Clark v. J.M. Benson Co., Inc.*, 789 F.2d 282, 286 (4th Cir. 1986). How an employee spends her time working – i.e., what she does while at work – "is a question of fact." *See Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986). Whether an employee's "particular activities excluded [her] from the overtime benefits of the FLSA

16

is a question of law." *Id.* Thus, "[t]he determination of whether an employee falls within the scope of a FLSA exemption is ultimately a legal question." *Walton v. Greenbrier Ford, Inc.*, 370 F.3d 446, 450 (4th Cir. 2004).

Defendants contend that Ms. Lane is an "exempt employee" who is not entitled to overtime pay under the FLSA and MWHL. (ECF No. 41, at 16). The Secretary of Labor has adopted regulations that set forth a three-part test for determining whether an employee is subject to the administrative exception: (1) the employee must be "compensated on a salary or fee basis at a rate of not less than $455 per week;" (2) the employee's primary duty must consist of "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers;" (3) the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a); Md. Code Ann. Lab. & Empl. § 3-403(a)(1) (including the administrative exemption in the MWHL). The parties agree that Ms. Lane was compensated at a salary rate not less than $455 per week. At issue, however, are whether her work was directly related to the management or general business operations of SA-TECH or its customers, and whether Ms. Lane exercised discretion and independent judgment on matters of significance.

17

**a. Work Directly Related to Management or Business Operations**

The applicable FLSA regulations provide guidance in determining whether an employee's primary job duty is administrative in nature, thus satisfying the administrative exemption requirement.  Under the regulations, "[t]he term 'primary duty' means the principal, main, major or most important duty that the employee performs.  Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."  *Id.* § 541.700(a).  Section 541.700(a) further explains that factors to consider when determining the primary duty of an employee include, but are not limited to:

> the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

"The phrase 'directly related to the management or general business operations' refers to the type of work performed by the employee."  *Id.* § 541.201(a).  An employee meets this requirement if she "perform[s] work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing

production line or selling a product in retail or service establishment." *Id.* 29 C.F.R. § 541.203(d) provides examples of functions falling under the administrative exemption, including:

> *An executive assistant or administrative assistant to a business owner or senior executive of a large business* generally meets the duties requirements for the administrative exemption if such employee, without specific instructions or prescribed procedures, has been delegated authority regarding matters of significance.

(emphasis added).

Plaintiff argues that most of her time was occupied doing personal work for Mr. Adams and his family. Mr. Adams is disabled and uses a wheelchair. Plaintiff submits an affidavit stating that she spent six hours daily and two hours on average each weekend working as a personal assistant. (See ECF No. 44-1, at 2). Ms. Lane avers that she: regularly prepared food for Mr. Adams; drove him to frequent doctors' appointments; organized holiday parties for his family; picked up his children from school; sent sporting event tickets to Mr. Adams's family members; drove and accompanied Mr. Adams to various meetings; and scheduled repairs for Mr. Adams's wheelchair. (*See* ECF No. 44-1, at 2-5, 7; ECF No. 44-2). Plaintiff further states that between September 2012 and July 2013, she took Mr. Adams to more than 100 appointments/meeting, each of which averaged four or

five hours.   (ECF No. 44-2, at 2 ¶ 32).   In her affidavit,
Plaintiff states that Mr. Adams "had justifiable needs [for] a
caregiver, and those caregiver duties were assigned to [her] as
[her] [p]rimary duty."  (ECF No. 44-1, at 4 ¶ 19).   She further
avers that "[t]he welfare and care of Mr. Adams was [her] 'most
important job' to the President/CEO and Owner of SA-Tech and it
is what [she] did majority of the time." (*Id.*).

Plaintiff relies heavily on the fact that the performance
of "personal" tasks for Mr. Adams consumed much of her time, but
the issue is the relative importance of the exempt duties
compared with other types of duties.   The amount of time spent
on personal as opposed to business-related tasks is not
dispositive on the issue of primary duty.   Plaintiff's reliance
on *Clark v. J.M. Benson Co., Inc.*, 789 F.2d 282 (4th Cir. 1986),
for the "50 Percent Rule" in assessing whether her primary duty
involved the performance of administrative duties related to the
management of SA-TECH, is misplaced.   As the United States of
Appeals for the Fourth Circuit explained in *Altemus v. Federal
Realty Inv. Trust*, 490 F.App'x 532, 536 (4th Cir. 2012):

> Following *Clark*, we clarified the
> application of the 50 percent "rule of
> thumb" in *Counts v. S.C. Elec. & Gas Co.*,
> stating:
>
> *Nothing in the FLSA compels any particular
> time frame for determining an employee's
> primary duty*.  To the extent the regulations
> refer to time at all, it is only to provide

> that 'a good rule of thumb [is] that primary
> duty means the major part, or over 50
> percent of the employee's time.'  29 C.F.R.
> §§ 541.103, 541.206. . . . [I]n fact, the
> regulations explicitly state 'time alone,
> however, is not the sole test,' and that any
> assessment of primary duty should be 'based
> on all the facts in a particular case.'  *Id.*
> It is clear from this language that the
> primary duty is meant to be assessed by the
> totality of the circumstances.  317 F.3d
> 453, 456 (4th Cir. 2003).
>
> Indeed, "*[e]mployees who do not spend more
> than 50 percent of their time performing
> exempt duties may nonetheless meet the
> primary duty requirement if the other
> factors support such a conclusion.*"  29
> C.F.R. § 541.700(b).

(emphases added).

Moreover, despite Plaintiff's attempts to create a genuine dispute of material fact with respect to the nature of her work, the record is replete with evidence that as the sole administrative assistant to the CEO of SA-TECH, Plaintiff performed duties that directly related to managing or servicing of the company.  Mr. Adams submitted an affidavit, in which he describes Ms. Lane's duties as follows: (1) managing his calendar and ensuring that he had no scheduling conflicts and assigning times and dates for his meetings; (2) screening his incoming phone calls and deciding who would talk to him; (3) preparing and submitting expense reports on his behalf, which involved independently contacting vendors as necessary to obtain receipts for accounting; (4) independently creating a list to

21

ensure listing of his contributions were recorded and accessible to assist with charitable and political donation records; (5) drafting and preparing documents for his review and approval; (6) sending emails drafted by Ms. Lane to employees and outside parties on his behalf; (7) handling all of his travel arrangements; and (8) attending meetings on his behalf. (ECF No. 41-9, at 2-3). As Defendants argue, "[a]lthough Plaintiff asserts that 'personal' tasks performed for the President and CEO of SA Tech comprised a majority of her work time, she does not dispute that she maintained responsibility to complete all other administrative tasks described in her position descriptions and/or otherwise assigned by CEO Timothy Adams." (ECF No. 45, at 2). For instance, Ms. Lane conceded during her deposition that she attended events on Mr. Adams's behalf. (*See* ECF No. 41-2, at 184 ("I am the executive assistant for Mr. Timothy Adams . . . [,] who has asked me to attend the [minority business] event on his behalf.")). Plaintiff gave deposition testimony that she has "gone to meetings for Mr. Adams, but not as him. If he asked me to show up and if I did, I would take notes, take them back to him." (*Id.* at 185; *see also id.* at 193 (synopsis of notes taken when Ms. Lane participated on a conference call on the behalf of Mr. Adams)).

The regulations provide a non-exhaustive list of work that is "directly related to management or general business

operations," including, "*personnel management; human resources; employee benefits; labor relations.*"   29 C.F.R.   §   541.201(b) (emphasis added).   In July 2011, SA-TECH won the Relocatable Over-the Horizon Radar ("ROTHR") contract in Chesapeake, Virginia, and Plaintiff was appointed the Human Resource liaison for all of the employees in Chesapeake, Virginia for this contract.   (*See* ECF No. 41-9, at 3).   Indeed, in an email dated August 31, 2011, Plaintiff wrote:

> The ROTHR contract has made it clear that there are some areas that I need to ensure I'm on top of the processes, which I'm still learning.   *Mr. Adams [is] holding me accountable for east coast HR needs, in particular ROTHR.   He has committed himself to allowing me the latitude to perform the HR responsibilities on the east coast.*

(ECF No. 41-13, at 10; *see also id.* at 40 (email from Ms. Lane regarding a partial onboarding of ROTHR employees)).   In October 2011, Mr. Adams requested that Ms. Lane "take the ROTHR personnel and provide direct oversight to them for all their HR Related issues," which is corroborated by an email from Ms. Lane to Karen Chergoski from the HR department of SA-TECH.   (*See* ECF No. 41-9, at 59; *see also id.* at 60, email from Ms. Lane ("I've been assigned as your POC for all HR Related concerns going forward and will [be] reaching out to you at least once [per] week to determine if there are any concerns or issues.")).   Plaintiff performed as a Human Resource liaison for the ROTHR

personnel until the end of her employment in July 2013. (ECF No. 41-9, at 3). Indeed, by email dated March 29, 2013, Plaintiff wrote to Karen Chergoski:

> Please let me be the front person for SA-Tech employees on the East Coast. If I need your assistance, I will let you know (of course) . . . *I need to be actively involved in the HR department and not just a passive participant – it is a key part of my job requirements in which I am expected to perform and am being evaluated on.*

(ECF No. 41-9, at 83) (emphasis added).[4]

Additionally, although Plaintiff attempts now to minimize her supervisory functions, she was supervisor of record for at least three employees, in which capacity she approved requests for leave, advised them about company policy, and assigned them work. Defendants submit an affidavit from Charles Alvin Smith Jr., who avers that Ms. Lane supervised him from early 2011 to July 2011. (ECF No. 41-11, at 1; *see also* ECF No. 46-1, at 103, email from Ms. Lane ("Please place Charles under my supervision.")). He states that Ms. Lane: independently approved his time-off and sick leave; independently gave him

---

[4] Plaintiff also served as the Human Resource Administrator for the corporate office of SA-TECH from July 2010 through July 2013. (*See* ECF No. 41-9, at 91-94; ECF No. 41-13, at 2). Mr. Adams avers that "[b]ecause of the lack of written procedures for in-processing new employees, on or around February 9, 2012, Renetta Lane independently drafted a new-hire script that she then used to in-process new employees both in the Corporate Office and in Chesapeake, Virginia. (ECF No. 41-9, at 4; *see also id.* at 120-123, new hire script).

tasks to perform, including instructing him to review accounting files with vendors; and discussed with him company policies and benefits.   (ECF No. 41-11, at 1-2).   Email exchanges substantiate that Ms. Lane acted in a supervisory capacity over Mr. Smith and assigned him projects. (*See id.* at 4-9, 61; *see also* ECF No. 46-1, at 109, email from Ms. Lane to Mr. Smith ("[A]s your supervisor, I need to know your whereabouts when you are not in the building.")).   Evidence on the record further reflects that Ms. Lane supervised Kyndra Jackson,[5] a receptionist, and Candice Williams.   (*See* ECF No. 41-12, at 3; *see also id.* at 25; ECF No. 41-15).   Indeed, Ms. Lane conceded during her deposition that she had authority to approve or disapprove leave without pay for the employees she supervised, including Charles Smith.   (ECF No. 41-2, at 156; *see also id.* at 157, email to Charles Smith regarding approved leave). Plaintiff also sent a termination letter to Kyndra Jackson, dated March 19, 2013, which she signed.   (ECF No. 41-2, at 164). She also represented herself as having "administrative oversight" over certain personnel and either conducted or coordinated interviews of prospective employees.   (*See id.* at 169, email exchange with John Huggins).

---

[5] Although Plaintiff asserts that her role with respect to Ms. Jackson was more akin to a "mentor," this reclassification is disingenuous considering the evidence on the record and email exchanges reflecting her role as a supervisor.

Moreover, from July 2010 to July 2013, Plaintiff operated as the administrator and organizer for the Board of Advisers for SA-TECH.  (*See* ECF No. 41-13, at 3, affidavit from Geoff DeZavala).  Email exchanges show that she prepared materials for the Board, planned events, coordinated meeting schedules, recorded and produced minutes, and monitored actions to ensure completion.  (*See id.* at 82-113).  Geoff DeZavala, the Senior Vice President and Chief Operating Officer of SA-TECH, avers that Ms. Lane also made several presentations to the Advisory Board on behalf of the Human Resources Department (in one of which instances Mr. DeZavala was a co-presenter), although Plaintiff asserts that she did not prepare the presentations but just read off materials prepared by someone else.  (*Id.* at 4). Both Mr. Adams and Mr. DeZavala state:

> All the assignments performed by Renetta Lane as sole Executive Administrative Assistant to the President and CEO of SA-Tech, Human Resource Liaison for all of the employees in Chesapeake, Virginia for the ROTHR contract, Human Resource administrator for the Corporate Office, a supervisor for several employees, the administrator and organizer for the Board of Advisers and Board of Directors for SA-TECH, and Office Manager for the Corporate Office were major assignments for the operations of SA-TECH's business and affected SA-TECH's business operations to a substantial degree.

(ECF No. 41-9, at 10; see also ECF No. 41-13, at 5); *see Seltzer v. Dresdner Kleinwort Wasserstein, Inc.*, 356 F.Supp.2d 288, 302

(S.D.N.Y. 2005) ("[T]he evidence shows that Seltzer was the 'lead assistant for Seegal. [] The other assistants covered the telephones when Seltzer was not at her desk and in off-hours when Seltzer was out of the office. . . . [I]t is not in dispute that Seltzer was the primary executive assistant.").

Indeed, the very emails and resumes authored by Plaintiff and submitted as evidence establish that her primary duty involved work directly related to the management or general business operations of SA-TECH. For instance, by email dated February 8, 2010, Plaintiff corresponded with Dennis May, Director with the Veteran Employment Services Office with the U.S. Department of Veterans Affairs, and attached a copy of her resume. (*See* ECF No. 41-2, at 122-123). In her resume, Ms. Lane described her duties as the senior executive assistant to the President/CEO of SA-Tech as follows:

> Reports directly to the President and CEO of $50M Department of Defense Contractor, with over 400 personnel assigned in 12 states, Japan, Italy and Guam. Attends meetings with and on the behalf of President/CEO, speaks on his behalf, provide guidance as he requires, the "go to" person in the Corporate Office. Handles confidential information that impacts the operation, and performance of the company; assist in management of all communication, both written and via email or voicemail, composes letters prepares agendas, attends meetings, transcribes correspondence, maintains extensive office files. Arranges for and schedules appointments, reviews materials for meetings and speaking engagements. Help

27

> plan and coordinates visits of distinguished
> guest.  Writes reports and edits speeches as
> requires.    Performs   special   projects.
> Process expense reports.    Provides Human
> Resources administrative support and Records
> Managements requirements company wide.

(*Id.* at 123; *see also id.* at 129 (substantially similar work description in another version of Lane's resume)).   Plaintiff conceded during her deposition that she contacted Mr. May –"a recruitment person for the federal agency, VA" to obtain his preliminary impressions of her resume.  (ECF No. 41-2, at 138).  In another version of her resume that Ms. Lane forwarded to a friend, Ozie Bradford, via an email dated May 29, 2012, Plaintiff described her responsibilities as follows:

- Oversee front-office operations and provides exemplary service
  o Developed a professional office environment, streamling processes and increasing efficiencies
- Prepares executive documents for President's review and approval
  o Creates memos *with little or no corrections required*
  o Able to interpret the essence of the required memo and produce desired outcome
- Administrator and Organizor of Board of Advisors to President and CEO
  o Prepares board material, event planner, coordinates meeting schedules, records and produce minutes, monitors actions assigned to ensure completion
  o *Board packages and meeting lauded as highly professional and well designed board books by board chair*
- Manages President and CEO calendar to ensure no scheduling conflicts and assign times and dates that will ensure the best success of the meetings

- *Monitors calls to determine transferring to President and CEO is necessary by obtaining reasons for call* and understanding the true nature of the call and transferring calls to appropriate executive other than President
- Prepares and submits expense reports on President's behalf
  - Contacts vendors as necessary to obtain necessary receipts for accounting
- Purchases office supplies; meets with vendors for competitive rates
- Administrator and Organizer of bi-yearly program manager's review – 5 day events for 30 person traveling from 14 states
- Human Resources Representative, providing employment verification; in-processing, out-processing of personnel, maintaining personnel records, *answering day-to-day HR questions from employees; responds to HR inquiries of personnel*
  - Prepared checklist and instruction document to assist in reducing the in-processing of new-hires and to ensure the required documents were discussed and submitted on-time.

(ECF No. 41-2, at 135-36) (emphases added).  Plaintiff appears also to have sent this version of her resume to Mr. May with Veterans Affairs.  (*Id.* at 139-143).  Although Plaintiff attempts now to minimize her duties, she stated during her deposition that she accurately represented to Mr. May the duties she performed at SA-TECH.  Plaintiff now challenges the frequency with which she performed those duties.  (*Id.* at 145-46).  Plaintiff previously conceded that the series of resumes she submitted contained true and accurate statements; she cannot create a genuine issue of material fact by qualifying her prior testimony or contradicting evidence on the record.

Ms. Lane states that "Executive Administrative Assistant position description does not contain any mention of [s]upervisory, [h]uman resources, [m]arketing, or [o]ffice management duties. These were not primary duties but infrequent tasking[] that came and went at the discretion of Mr. Adams. Plaintiff[']s primary duties were never changed, were performed concurrently with additional tasks leading [to] increasing [] hours worked. Plaintiff's primary duties especially driving took priority over these additional temporary and sporadic assignments." (ECF No. 44, at 25).

Plaintiff's assertions are belied by the overwhelming evidence on the record, however, which reflects that she was far more extensively involved as an executive assistant or administrative assistant performing the kinds of duties individuals in such exempt positions perform, than she now admits. *See, e.g., Altemus*, 490 F.App'x at 536 ("[D]espite Altemus' attempts to create an issue of material fact with respect to the nature of her work, the district court correctly concluded that Altemus' self-serving affidavit was unsupported by the record, which includes ample evidence of her business-related duties as the sole executive assistant to the CEO of a large company. In light of extensive evidence to the contrary, Altemus' affidavit amounts only to a 'scintilla of evidence.'"). The relevant inquiry is *not* what's stated in her position

description, but the duties that Plaintiff actually performed in her role as the sole executive assistant to Mr. Adams. Moreover, email exchanges show that Plaintiff signed as "Senior Executive to President and CEO," (*see* ECF No. 41-10, at 60) and as "Director of Administration,"[6] a title over which Mr. DeZavala expressed concern (*see* ECF No. 41-13, at 129-135). Indeed, Plaintiff authored a description of her duties as "Director of Administration," which included, *inter alia*: directing the overall daily corporate office operations; overseeing human resources; overseeing facilities management; overseeing headquarters operations; overseeing finance; directing public information and relations; overseeing records managements; serving as a liaison to Board of Directors and Board of Advisors; and developing and executing plans for special corporate projects. (ECF No. 41-13, at 135). Plaintiff's attempts now to downplay these responsibilities and argue that her primary duty was serving as a personal caregiver fly in the face of the record.

---

[6] By email dated March 28, 2013, Mr. DeZavala explained that a title such as Director of Administration or "Chief of Corporate Administration," an alternative title suggested by Ms. Lane, would be misleading. He elaborated: "[f]rom the title, most folks would view that you run all Administrative functions Corporate-wide, which is just not accurate. *You perform this at the Corporate office location, but not any other location.* That's the problem with terms 'Director' and 'Chief' they are viewed as an overall Corporate-wide position and would cause confusion among our employees and outside entities." (ECF No. 41-13, at 131) (emphasis added).

Plaintiff also submits affidavits from former employees of SA-TECH, none of which support a different conclusion with regard to the "primary duty" analysis. Specifically, Plaintiff offers an affidavit from Brenda Ables, a former Director of Human Resources with SA-TECH, who was terminated from the company on March 19, 2010. (ECF No. 44-5, at 6). She states that Ms. Lane's duties "looked more like Personal Assistant, caregiver, with some light administrative duties" and that she previously expressed to Mr. Adams her belief that Ms. Lane was misclassified as exempt under the FLSA. (*Id.*). Although the affidavit from Ms. Ables describes Ms. Lane performing work of a personal nature for Mr. Adams, the affidavit does *not* negate all of the administrative duties and business-related duties that Ms. Lane *also* performed. Indeed, Ms. Ables notes Plaintiff's involvement with the Advisory Board. (*Id.* at 7). Moreover, claims for violations of the FLSA must be brought within two years, except that the statute of limitations is extended to three years for willful violations. 29 U.S.C. § 255(a). Even assuming the three-year statute of limitations applies here, Plaintiff's recovery of damages for alleged overtime hours worked is limited from November 2010 until November 2013, when she filed her lawsuit. Ms. Ables was terminated in *March 2010*, which precedes the time period for which Plaintiff can recover overtime compensation. The affidavits from former employees

Yolanda Reid (ECF No. 44-4, at 12-15) and Shernett Gardender (ECF No. 44-4, at 9-11), similarly do not contradict that Plaintiff performed exempt duties.   Moreover, both employees' tenure with SA-TECH similarly ended prior to the applicable time period for which Plaintiff possibly could recover overtime compensation.   Finally, Plaintiff submits an affidavit from Felicia Townes, who succeeded Plaintiff as the Executive Administrative Assistant to Mr. Adams.   (*Id.* at 16-23).   Ms. Townes states that the "position turned more into a personal assistant job than that of an Executive Administrative Assistant."   (*Id.* at 16).   Ms. Townes accepted the position on September 30, 2013, *after* Plaintiff left her employment with SA-TECH, and thus cannot speak to *Ms. Lane's* primary duty during the applicable time period.

In *Altemus*, 490 F.App'x 532, the Fourth Circuit affirmed summary judgment for defendants under similar factual circumstances.   In that case, the employee, Altemus, also served as the sole executive assistant to the CEO and General Counsel/COO of a large equity real estate investment trust.   The court noted:

> Altemus alleged that her administrative tasks as the sole executive assistant to Wood typically took no more than 20 to 25 percent of her time, *while her responsibilities for performing personal work for Wood and his family required 75 to 80 percent of her time.*   With respect to

> personal tasks performed for Wood and his
> family, Altemus indicated that she planned
> his annual personal holiday party, scheduled
> doctors appointments, managed his personal
> travel, purchased tickets to sporting and
> theatre events, occasionally picked up his
> children from school, and assisted Wood with
> his role as little league coach for his
> son's baseball team for two seasons, among
> other tasks. In addition, Altemus stated
> that she spent a significant amount of her
> time working on projects related to the CFF
> [a charitable organization in which Wood
> participated for both personal and business
> reasons], work that she claimed was
> unrelated to the management of FRIT.

*Id.* at 533-34 (emphasis added).

In granting summary judgment for defendants, Judge Messitte "rejected Altemus' allegation that she only spent 20 to 25 percent of her time completing administrative duties directly related to the management of FRIT and exercised little to no discretion, finding this proposition directly contradicted by the record, including the job description for the executive administrative assistant position and the *performance reviews completed by Wood describing Altemus' responsibilities*." *Id.* at 534 (emphasis added). The Fourth Circuit agreed, reasoning:

> Although Altemus claims that she spent 75 to
> 80 percent of her time performing personal
> tasks for Wood, *she does not allege that her
> personal work for Wood supplanted her
> administrative tasks* or that she diverted
> administrative tasks to other assistants.
> Altemus worked as the sole executive
> assistant to both the CEO and COO of FRIT, a
> company with more than 400 employees. *She
> held this position 100 percent of the time.*

34

> *Although Altemus claims that personal tasks*
> *for Wood required a majority of her time,*
> *she nonetheless maintained a responsibility*
> *to complete her administrative tasks at all*
> *times.*

*Id.* at 536 (emphases added).  The same logic applies here.

Based on the foregoing, Defendants have established that Plaintiff's primary duty involved performing administrative tasks for the management of SA-TECH.

**b. Discretion and Independent Judgment**

The next issue is whether Plaintiff's primary job duty included the exercise of discretion and independent judgment with respect to matters of significance.  The DOL's interpretive regulations explain that, generally, the exercise of discretion and independent judgment "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."  29 C.F.R. § 541.202(a).  The "phrase 'discretion and independent judgment' must be applied in the light of all facts involved in the particular employment situation in which the question arises."  "Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to:"

> whether the employee has authority to
> formulate, affect, interpret, or implement
> management policies or operating practices;

> *whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business;* whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b) (emphasis added).

An employee, however, does not exercise discretion and independent judgment if her work amounts to nothing more than "the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." *Id.* § 541.202(e). Although "[t]he exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision . . . ., *employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level.*" *Id.* §

36

541.202(c) (emphasis added); *Andrade*, 700 F.Supp.2d at 747 ("Discretion may be exercised even when the decisions of an employee are subject to review."). Indeed, "decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action." 29 C.F.R. § 541.202(e); *see, e.g.*, *West v. Anne Arundel County*, 137 F.3d 752, 764 (4th Cir. 1998) (explaining that the "fact that some recommendations made by [an employee] are subject to review by superior officers is no bar to application of the administrative exemption.").

Plaintiff asserts that although she had many tasks, she was controlled and micromanaged by Mr. Adams and that he approved every function she performed. In *Altemus*, 490 F.App'x at 534, plaintiff similarly alleged that "her work as Wood's executive administrative assistant 'involved only minimal exercise of discretion or independent judgment,' as 'Wood often micro-managed tasks and took control of even the most basic decision making of those tasks.'" The Fourth Circuit agreed with the district court, however, that plaintiff exercised independent discretion as the sole executive assistant to the CEO of the company:

> As previously discussed, the factual assertions in Altemus' affidavit fly in the face of the record as a whole, which establishes Altemus' significant responsibilities as the sole executive

> assistant to the CEO of a large company.
> The performance reviews prepared by Wood
> reflect the high level of independence and
> discretion Altemus enjoyed.

Here, too, the record establishes that Ms. Lane exercised independent judgment and discretion in serving as the point person on human resources issues pertaining to the ROTHR contract and the corporate office, in screening phone calls for Mr. Adams, drafting letters for Mr. Adams's signature, following up with members of the Advisory Board on action items, and executing her supervisory responsibilities, such as approving her employees' leave, informing them about HR policy, and delegating work assignments.  Indeed, her own resumes – that she admits accurately reflect duties that she performed – show that she exercised independent judgment and discretion.

Finally, the Fourth Circuit has stated that when an employee receives a high salary, the "high salary itself creates doubt as to whether [the employee] falls within the scope of the intended protected class in light of the legislative goals of the FLSA." *Altemus*, 490 F.App'x at 537; *Andrade*, 700 F.Supp.2d at 745.  "Although salary alone is not dispositive under the FLSA, . . . the FLSA was meant to protect low paid rank and file employees." *Darveau v. Detecon, Inc.*, 515 F.3d 334, 38 (4th Cir. 2008) (internal quotation marks and citation omitted); *see also Counts*, 317 F.3d at 456 ("[The] FLSA was meant to protect low

paid rank and file employees, not higher salaried managerial and *administrative employees* who are seldom the victims of substandard working conditions and low wages.") (emphasis added).   The FLSA's implementing regulations state that "[a] high level of compensation is a strong indicator of an employee's exempt status."   29 C.F.R. § 541.601(c).   Although the parties provide different figures as to Plaintiff's annual compensation — with Defendants contending she earned approximately $82,000 per year and Plaintiff stating that she earned between $73,000 and $74,000 per year - her salary still was relatively high.

Based on the foregoing, Plaintiff falls within the administrative exemption under the FLSA.   Accordingly, summary judgment will be granted to Defendants on all the claims in the complaint.[7]

### D.  Discovery Motions

Before Defendants moved for summary judgment, both parties filed numerous discovery-related motions.  (*See* ECF Nos. 21, 23, 35, 37).  Specifically, Defendants moved to compel production of certain documents.  (*See* ECF No. 22; ECF No. 30, at 3 (Defendants' reply memorandum narrowing scope of motion to

---

[7] The MWPCL claim in the complaint is premised on Plaintiff's entitlement to overtime payments.  Because Plaintiff is not entitled to overtime under the FLSA and MWHL, summary judgment also will be entered in favor of Defendants on the MWPCL claim.

compel)).[8]   Plaintiff moved to quash a subpoena issued for her medical records, (ECF No. 35), and also moved for an extension of time to complete discovery (ECF No. 37).   Neither party argued that it needed the disputed discovery on summary judgment.

Because summary judgment will be granted for Defendants, these motions will be denied as moot.

## III. Conclusion

For the foregoing reasons, the motion for summary judgment filed by Defendants will be granted.   The two motions to suppress filed by Plaintiff will be denied.   Plaintiffs' motion for leave to amend her opposition will be denied.   All remaining discovery-related motions will be denied as moot.   A separate order will follow.

/s/
DEBORAH K. CHASANOW
United States District Judge

---

[8] Defendants also moved to expedite hearing on their motion to compel.   (*See* ECF No. 23).